Our second case for this morning is FTI Consulting, Inc. v. Merit Management Group. Mr. Schwegman. Good morning, Your Honor. Good morning. Greg Schwegman on behalf of the appellant plaintiff. May it please the court. In their voluminous briefings on the- Could I just ask you something to start? Yes, ma'am. I know that the district court decided the case on the pleadings, but is the escrow agreement in the record? I believe the escrow agreement is in the record. It is. What, if anything, does the record tell us about the rights and obligations of the financial institution involved in this transaction? In other words, how can we determine if the payments were made by or to any of the protected entities without seeing the terms of the deal? That's a fair point. The escrow agreement, as I understand it, and this was never actually fully briefed or litigated, this particular point, but as I understand it, the escrow agreement, the escrow agent denies having any interest or rights in the property held in escrow. So they must have charged some sort of fee or something to serve as- Absolutely. The escrow agent certainly got a fee for that, and so did Credit Swiss, who was the lender for Valley View Downs, the debtor in this case. So your issue is that you're swimming upstream, right? Absolutely. You've got all of these circuits who have not agreed with your reading of the statute, and you have a split decision in the 11th Circuit that has gone your way, and you have legislation which I'm going to say could be read maybe the way you're reading, except no one else is doing it, or it could just be special interest legislation for the financial industry, and it wouldn't be the first of those kinds of laws that actually say, we're just going to keep it simple, we're going to be literal, and we're going to say that if a payment is made to a financial institution, which certainly funding the escrow account would be, then that's that. Well, that's certainly, and we don't disagree, that that is certainly a literal interpretation of the language. And it's simple. You don't have to trace things through a lot of steps. Because it's simple doesn't necessarily mean that it is correct. But it could be one reason to want to read it that way. That's certainly one reason, but not necessarily the right reason under the principles of statutory interpretation that we set forth in our brief. I want to go back real quickly to the point you made about the fees, because the District Court had a footnote about the fees, and I think that's an important point, and that's an important distinction, is that to the extent that the debtor paid fees to either the escrow agent or Credit Suisse for their role, that's an entirely different transfer. That's a transfer of interest in different property. We are not trying to avoid that transfer. And that there is two different transfers, to the extent they received a fee, that there would be two different transfers helps to make the point, is that that is a transfer that is clearly covered by the statute, whereas the transfer that just merely passes through the escrow agent is not a transfer covered by the statute. What did the words of the amendment for the benefit of add to the statute? Because under your reading of the statute, those words would seem to be superfluous. Could you kindly give us an example of a transaction where those words would come into play? In other words, where they would make a difference to the outcome? Well, they wouldn't make a difference to the outcome here, because they would not make a difference to the outcome here, because no one's arguing, no one's taking the position that any of these transfers were made for the benefit of a protected entity. Now, Section 550 says specifically that a trustee can recover from a transferee, whether it's immediate or immediate, or one who receives the benefit of the transfer. So an example of that is if... Well, now you, if I understand correctly, you want to be able to And the theory that that was, that belongs to the bankrupt estate, that money. Correct, under a constructive fraudulent transfer. Now, there are these intermediate companies through which the money passed en route to merit. And so one of them, Credit Suisse, that's the bank, right? Correct. So, can Credit Suisse be harmed? Absolutely not, and that's the By your being able to recapture this money for merit? Absolutely not. That's the central point to our brief. And your point is the reason it can't be is that it's been paid for whatever role it was serving for merit. No one's trying to get that money back for them. For all we know, they might be paid again for the transfer back again to the bankruptcy estate. Sure, that's right, but there's two reasons why Credit Suisse can't be harmed. Congress took care of this with both 546 and with 550. Those two provisions work together. Because Credit Suisse is not a transferee or a transferee. It was not an entity who lost any interest in property. It's not a transferee or a transferee. It can't be held liable for under fraudulent transfer liability. Also, because That's the 550 part of it? That's correct, the transferee part of it. Since Credit Suisse could in no way be considered a transferee because it never had an interest dominion and control, as this court held and bonded, that had dominion and control over the funds, it can't be held liable as a transferee. Further, stepping into the legislative history just for a moment, when Congress originally passed 546C, it did so in response to a case called Siegelson. In Siegelson, the issue is this precise question is whether a financial intermediary in the commodities markets could be held liable for fraudulent transfer liability as a transferee. Well, the Congress said, we don't know how this is going to shake out. We do now after bonded and some cases in the Second Circuit. But we didn't then. And Congress said, well, we're just going to pass 546E to prevent this question from even having to be answered. So Credit Suisse has protections on both sides. It has protection from 546E because if we tried to sue Credit Suisse, we couldn't receive, we would lose on 546E. And also, they're not a transferee. So you're essentially saying that this is the same as if the people representing Valley View Downs had gone to merit with a lot of suitcases full of $100 bills adding up to $16.5 million, which certain industries do, but you're probably more legitimate than they are. I actually have a suitcase full of cash written in my notes here. Well, that's my understanding. No, written in my notes. Of your point that when it's these banks, essentially, who are the intermediaries, they don't have their own independent, actually, they have a debtor relationship to whoever the funds belong to, and that you don't think it should make any difference. No. I just might add a suitcase full of cash and a return of stock certificates for that suitcase would not be covered. And that's the central issue, I think, the central problem with merits interpretation of this statute, and quite frankly, the district courts and five other circuits, that if you think, okay, let me say this correctly, that Congress intended to draw this distinction between the methods of transfer with 546Z, then, well, you have to think that to think that this interpretation is correct, because suitcase full of cash, not transferred, not barred from avoidance, passes through financial institution via wire transfer, barred from avoidance. But what is the indication that Congress envisaged a case like this? What is, well, I think I'd put it in a negative, is that Congress wasn't concerned with a case like this, a case where the financial intermediary was just a pass-through. Congress was concerned with protecting the securities markets. But the statute is very unclearly drafted. Agreed. Very ambiguous. And there's no reason to think they envisaged a situation like this. I agree. There is not one. So can we do any better than to find a sensible solution? Why talk about Congress? As with many so-called statutory interpretation cases, the case that comes to the court involves something that the legislature did not envisage, right? That is absolutely a fair point. And so I thought your point was that the sensible solution is to understand that when the financial intermediaries are really just processing wire transfers or checks or whatever it is they do these days, electronic transfers of funds, there's not the right kind of interest in the financial institution to mean that that's the transfer that counts from customer of bank to bank. And so your argument, as I understand it, is that. Now I wonder if Merit was owned by some other company, would you there have a situation where maybe the transfer was for the benefit of someone else? Potentially. That's right. Merit is owned by C. You're saying that Credit Suisse is like an armored car that carries the money from. That carries the money to Merit. Credit Suisse is providing a service just like  It suffers no liability. It suffers no risks. I will reserve the rest of my time. You are welcome to reserve the rest of your time. Thank you. Mr. DeJoncker. May it please the Court, Your Honors. Jason DeJoncker from Merit Management LP. I want to start out with a point that was raised earlier about a suitcase full of money. And whether or not this type of transaction was originally anticipated by Congress when this particular statute was enacted and then the decision that was reached last week in the Tribune fraud litigation by the Second Circuit. It's not cited in the briefs because frankly it was rendered last week, which dealt with Section 546E in a lot of detail. And frankly dealt with transactions like this one, which is a leveraged buyout situation. Well, the Second Circuit has already been on record for this, so that's not too surprising. What policy reason supports your reading of the statute? In other words, why would Congress have wanted to protect these kinds of transactions simply because a protected entity functioned as a conduit for the deal? Do you really think that Congress thought it necessary to protect the securities markets from the fallout of bankruptcy on the investors generally? And investors generally use mechanisms to move money. Unless you're, what I was alluding to before, unless you're a drug dealer or something, you are probably going to in some fashion or another use the facilities of the financial industry. And if they get paid separately for their activities, whether it's setting up an escrow account, whether it's simply carrying out client instructions for a wire transfer, I don't see where they have any interest. And I don't see the domino effect of, you know, A fails, so B fails, so C fails. The financial intermediaries are completely insulated. Well, Your Honor, I don't think the statute's necessarily just limited to protecting the financial intermediary. Well, but the thing is we have to understand what does it mean to say that the trustee may not avoid a transfer that is, et cetera, a settlement payment made by or to or for the benefit of all these people, you know, commodity broker, financial institution, and so forth. So this is not a settlement payment that's being made to your broker, you know, or to your financial institution, which is going to perform a service with the money for you. It's just sort of shooting it along and it's separately paid for. There's no risk. Your Honor, I would speculate. And because, unfortunately, when one looks at legislative history, I think one's always speculating. Look, you're not responding. Look, what is the difference between Credit Suisse as an intermediary here and my example of an armored car? Your Honor, I guess the difference would be this is a leveraged buyout transaction. Pardon? Your Honor, I guess the difference would be... Would you just answer me? The armored car, Your Honor, is not lending money, necessarily. In this situation, Credit Suisse lent money as part of a leveraged buyout transaction, provided and paid the money over to an escrow agent, which was then entrusted with going to the various shareholders of Bedford Downs, collecting their securities, transferring their securities back to the debtor. Right, because they're all services that they perform for separate consideration that the trustee has represented. He's not trying to claw back. But, Your Honor, that's every securities transaction, generally speaking, whether it's a small securities transaction or a large. So if you walk your securities over to the entity that bought them, then this doesn't count? Or if it's Judge Posner's armored car moving the money around, it doesn't count? Your Honor, I don't disagree. You're absolutely correct. The statute, I would... So what sense does it make, is the next question, to draw that distinction? Your Honor, I would guess the sense that was made by Congress is that the majority of transactions... No, Congress did not envisage this situation. Come on. Well, I think Congress envisioned a situation, Your Honor, where there is... No, they did not envisage this situation. What we're saying is it doesn't help your argument to add that sentence. I think we can all agree this is an ambiguous statute. Right. And as an ambiguous statute, it is up to somebody, apparently us, today, to make some sense of it. And so we can just go straight to the heart of the matter. I guess, Your Honor, when I look at the statute, and I look at leveraged buyout transactions like this one, whether it's small or large, the money, 99.9% of the time, is going to move through a financial intermediary of some type. And so when Congress drafted the statute, they looked at that economic reality and said, well, we want to cover the world for the most part of these publicly traded markets, are going to occur through financial intermediaries. Now, I would guess that Congress looked at these transactions and said, well, we don't care if it's publicly traded or privately traded. We want to impress upon the securities market, which includes both publicly and privately traded transactions, that we are going to protect them. So that I, as an investor, when I receive a payment in a leveraged buyout transaction like this one... What was the danger to Credit Suisse? Well, I don't know if there's a danger to Credit Suisse, Your Honor. I think there's a danger to the financial market. Why? Because if I could immediately turn around and unwind all these transactions, this one involved 15 shareholders. So you just give them instructions to... In fact, you give merit instructions to send money back, and the financial intermediaries perform their mechanical role. The word that you just used that I wanted to seize on for a minute is the word intermediary, because we seem to be talking about a transfer, and it's either a transfer from Valley originally to merit, or as you would like us to say, it's a transfer to everybody who has anything to do with it. It's a transfer to the clerk in the bank who walks the instruction over to the wire transfer department. It's a transfer to whoever it was who sat there at their computer and set up the escrow accounts. I mean, there are probably 15 transfers in there. Your Honor, I'm not honestly saying that we're looking at every participant in the transaction. But then why not look at the economically relevant transfer, which is the one from Valley to merit? Well, Your Honor, it's actually a transfer from Valley to all of the shareholders of the company. But we're worried about the 16.5 that went to them. Nobody seems to be contesting that. I would suggest that Congress was looking at the broadest possible way to protect the entirety of the financial markets. What is the risk that it has? The risk would be, Your Honor, that the 14 arms length transaction. Are you talking about merits? Merit, correct. Arms length transaction. So merit has received money from a bank that it shouldn't have received. And you want to be able to keep it. And you think that that hurts the bank. That's what I don't think. I can see where it would hurt Valley. I can see where it would hurt merit if its shareholders go off and fritter the money away or whatever they do to it. I'm not sure how that hurts the financial institutions who stand, the two of them in this instance, who stand in the middle. Your Honor, I think we have a difference of opinion as to who's being protected. I'm not saying that the individual financial institutions. The financial, the securities market. Tell us who is being protected. What does that mean? If merit gives money back to Valley, how is the securities market impaired? The securities market depends on, Your Honor, my ability as an investor. In concrete, merit is ordered to pay back money to Valley. It then has to go out and unwind another. Sorry, Your Honor. My apology. Merit is ordered to pay back money that belongs to the bankrupt estate. Now how does that harm the securities markets? It harms the securities markets, Your Honor, because merit goes out and lends or invests in other investments based on the finality of the transaction. You could say this about any avoidable transaction. You could say, well, if you take the avoidable, if you take the money away from the recipient, you hurt the recipient and his dependents and this and that and the other. So you would just be abolishing the concept of an avoidable transaction. And let me add that you also, to the extent you're focusing on merit, you're not talking about somebody within the scope of 546E anyway. Merit's not a financial institution. Merit's a racetrack. And so you need to somehow get from this harm that you're describing to merit to some kind of cognizable harm to either Credit Suisse or the other, I'm forgetting who they are, the other financial intermediary. Your Honor, I think you need to step back with respect to what originally occurred in this deal. Merit management steps forward and it invests in an entity called Bedford Downs, which goes out and tries to pursue a horse track. They want their racino. At the same time, Value Downs puts forth its presentation. Value Downs, I believe, was publicly traded at that point. These are two entities that are They fight for a long time. And at that point, Value Downs decides, we want to buy the shares of Bedford Management. It's going to be a share transaction. They're going to consolidate that. And so there are a group of investors that had invested in Bedford who get paid out as part of that transaction. It's a clear securities transaction. From Value to Bedford Management. So what you're not focusing on is how unwinding this is going to hurt Citizens Bank, the escrow agent, and Credit Suisse, who it seems to me would be perfectly happy if somebody comes to them and says, please execute this wire transfer. They would say, fine. That's what we're in the business of doing. I guess, Your Honor, and again, I think we're perhaps talking past each other. I'm not focused on the risk to the bank. But we need to because the statute covers transfers to the financial institution. That's what this case is about. Well, Your Honor, my statement would be that was the mechanism by which Congress decided it would be the easiest to separate out securities transactions of this type in order to protect the securities market. But if you're reading and the statute is correct, then why even mention financial institutions? Why not just provide a safe harbor for settlement payments and securities contracts? Why did Congress mention the list of protected entities unless it meant that these protected entities were principles in the transactions rather than mere conduits? Much of your argument, the argument that you're making right now, seems to me to render the list of protected entities totally superfluous. Your Honor, I would suggest first that, again, I think Congress looked at that list and said, well, most transactions of a certain size that we want to protect, securities transactions, are going to move through those entities. And I'm sure there were some, as this Court suggested earlier, some lobbying on the part of entities that are in this realm to have these transactions protected so that not only would a debtor not be able to go against them, but the investors that are investing in these transactions would not be able to. But you have conceded that there is absolutely no harm that you can point to for either Citizens Bank or Credit Suisse in this. They mechanically executed their instructions in one direction. They could equally mechanically execute unwinding instructions in the other direction. Your Honor, I completely agree with that. I do not see any damage to Credit Suisse. Is it investors to merit that worry you? It would be the investors of merit, the investors of balance. But look, that's what's so ridiculous. Because any time there's an unlawful, you know, when a company on the verge of bankruptcy picks out a favored creditor and gives them money, you know, that's an avoidable transaction. Now the recipient of that money no doubt has investors. But you don't protect the investors. The money has to be given back to the, you know, to the trustee in bankruptcy. Your Honor, how is this any different from that? Well, Your Honor, the difference would be is that Congress was intending to protect securities markets specifically. But look, now you're saying any recipient of an avoidable, you know, money not entitled to, who has investors, who has stock and people own its stock, the doctrine of the avoidable transaction simply does not apply. It only applies to entities receiving money who don't have stockholders. Well, no, Your Honor. Is that your proposition? It's not, Your Honor. But my proposition is that at the end of the day, if a company, the company that is being bought out in a leveraged buyout transaction has shareholders, right, and that company's shareholders are receiving, it doesn't make a difference if it's an individual or a company. Congress was saying, well, Merit has shareholders, or it has investors, or, you know, whatever it has. Somebody has the beneficial interest in the company, and you want to protect those people. No, actually, Your Honor, I'm trying to protect Bedford Downs shareholders, which is a level up. I don't think it makes a difference. Merit's a limited partnership, actually, so it doesn't even have shareholders. It has limited partners. You know, I'd just like to quote, if I can, from the Second Service decision. Well, Merit is the defendant. I don't understand. You're not interested in Merit? Your Honor, I am, but it's not part of the argument that I'm trying to raise here. I'm not going a level down. I'm looking at Bedford Management, which was the leveraged buyout target and its shareholders, all of which received payments through two financial intermediaries, which we would argue represent Merit. I don't understand. You represent Merit, but your only concern is with Bedford Downs? No, my concern is with Merit as a shareholder of Bedford Downs, Your Honor, not the individual shareholders below Merit. I have to ask you this question. If I hand a $5 bill to Judge Posner, was that payment made to Judge Wood and then by Judge Wood, or is the more natural meaning that the payment was made by me to Judge Posner? Your Honor, it was made by you to Judge Wood, and then Judge Wood made the transfer to Judge Posner. That does not mean that Judge Wood is a transferor or transferee within the scope of the definition of Section 550. Okay, I think we will leave it at that, and thank you very much. You saved a little bit of time, Mr. Schweigman. I'm not sure who that belongs to, but we'll deal with it later. I just want to put a finer point on one thing Judge Roedner said, the question about why are these entities here in any event? If Congress was concerned about protecting the entities, and I think the answer is obvious, from my position at least, is that Congress intended the State of Florida to apply when those entities are the parties to the contracts at issue, to the securities contracts. And a lot of them might be, a commodity broker, a forward contract merchant, a stock broker. Absolutely, but one thing we know is that there are other safe harbors in 546, which help go to this point. 546EF refers, deals with protecting transfers made in connections with repurchase agreements. And the specific entities listed there are only the entities that you'd expect to be parties to repurchase agreements, specifically repo participants and financial participants. Same is true for the next safe harbor down, 546G, which deals with transfers, protects transfers made by or to swap participants and financial participants in connection with swap agreements. Again, connecting the type of transfers they're concerned about with the type of entities that would be parties to those contracts. So it just, and that is further supported by, I won't go into all of the sections of the. That's fine, you don't need to do that. Right. And then also to Judge Posner's point, as far as the same is true, you made the comment that the same is true for any defendant in a fraudulent transfer action, that there would be downstream effects. The same is true for any defendant in any action, period. Any time a defendant is harmed or any time a defendant has to pay a judgment to a plaintiff, there's going to be downstream effects. That's the nature of our legal system. Unless there's any more questions, that's all I have. No, apparently not. Thank you very much. Thanks to both counsel. We will take this case under advisement.